|  |  |
|---|---|
| MICHAEL J. SULLIVAN, | Case No.: 1:15-cv-00243-DAD-SAB (PC) |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| M. D. BITER, | |
| Defendant. | [ECF No. 90] |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Plaintiff Michael J. Sullivan is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendant's motion for summary judgment, filed on June 5, 2020.

**I.**

**RELEVANT BACKGROUND**

This action proceeds on Plaintiff's claim of conditions of confinement in violation of the Eighth Amendment against Defendant Biter, arising out of allegations of arsenic-contaminated drinking water at Kern Valley State Prison ("KVSP").

On August 21, 2018, Defendant filed an answer to the complaint. (ECF No. 60.) On August 22, 2018, the Court issued the discovery and scheduling order. (ECF No. 61.)

1

As previously stated, on June 5, 2020, Defendant filed a motion for summary judgment. (ECF No. 90.) Despite receiving four extensions of time, Plaintiff did not file an opposition.

## II.

## LEGAL STANDARD

### A.     Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

A verified complaint signed under penalty of perjury may be considered an affidavit in opposition to a motion for summary judgment to the extent that it sets forth facts within the Plaintiff's personal knowledge that are admissible into evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995); see also Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause [the plaintiff] is pro se, we must consider as evidence in his opposition to summary judgment all of [the plaintiff's]

contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct."); accord King v. Cty. of Los Angeles, 885 F.3d 548, 553 (9th Cir. 2018).

Here, Plaintiff's operative complaint is verified. (ECF No. 1.) Therefore, pursuant to Jones, the Court will consider the factual allegations in the complaint which are clearly based on his personal knowledge.

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A.   Summary of Plaintiff's Relevant Allegations

Plaintiff alleges that when he arrived at KVSP in 2010, the drinking water was contaminated with toxic levels of arsenic and "cancer causing agents." (Compl. ¶ 29.) Plaintiff alleges that he has "preexisting chronic life threatening liver disease, a kidney tumor and stomach problems." (Id.) Plaintiff alleges that he has "confronted" the prison officials with knowledge of the tainted water by the filing of inmate grievances. As to Defendant Warden Biter, Plaintiff alleges that each year since October 1, 2010, Warden Biter has issued a notice "acknowledging that the drinking water was contaminated and also acknowledging the risk of adverse health effects including but not limited to increased risk of getting cancer and can or may cause circulatory system problems." (Id. at ¶ 30.)

The notice, attached as an exhibit to Plaintiff's complaint, was signed by Defendant Biter on September 23, 2010, and notified Plaintiff that the running annual average level of drinking water contaminants for wells 1 and 2 exceeded the United States Environmental Protection Agency ("USEPA") standard by .004 and .01 mg/L over the last four quarters. The notice informed Plaintiff

3

that Defendant Biter, along with KVSP staff, was working on planning and construction of an arsenic treatment system to resolve the problem. The notice indicates that Defendant Biter anticipated resolving the problem by October 2011. (Id. at p. 35.)

On December 3, 2010, Plaintiff filed an inmate grievance, requesting that he be provided with bottled water. Plaintiff alleges that on May 11, 2011, Health Program Specialist Bluford and Chief Medical Executive Lopez failed to correct or remedy Plaintiff's concerns by denying Plaintiff's grievance.

### B. Request for Judicial Notice

Defendant Biter requests the Court take judicial notice of the March 31, 2013 Quarterly Status Report of Capital Outlay Projects for CDCR and the State Water Resources Control Board, Division of Water Quality GAMA Program, Groundwater Information Sheet (July 6, 2010 version). (Req. for Judicial Not. (RJN), Exs. B &C, ECF No. 91.)

Federal Rule of Evidence 201 permits the Court to take judicial notice at any time. A judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources who accuracy reasonably cannot be questioned. Fed. R. Evid. 201(b). Courts may take judicial notice of facts related to the case before it. Amphibious Partners, LLC v. Redman, 534 F.3d 1357, 1361-1362 (10th Cir. 2008) (district court was entitled to take judicial notice of its memorandum of order and judgment from previous case involving same parties).

Under Rule 201, the court can take judicial notice of the records and reports of administrative bodies. Winnemem Wintu Tribe v. U.S. Dep't of Interior, 725 F. Supp. 2d 1119, 1131 (E.D. Cal. 2010). The court's authority includes taking judicial notice of government reports. Mobil Oil Corp. v. Tennessee Val. Auth., 387 F. Supp. 498, 500 fn.1 (N.D. Ala. 1974) (taking judicial notice of Tennessee Valley Authority reports).

Because the Court may take judicial notice of public records, Defendant's request to take judicial notice of Exhibits B and C is granted.

///

///

**C.    Statement of Undisputed Facts[1,2]**

1. Plaintiff Michael J. Sullivan is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR). (Heath Decl., Ex. J.)

2. Plaintiff was incarcerated at Kern Valley State prison (KVSP) from October 27, 2005 to July 14, 2006, and October 13, 2010 to 2015. (Id.; Ex. K (Pl. Dep. at 40:5-11.)

3. Defendant M. Biter became KVSP's acting Warden in August 2010, and he was named the Warden in February 2013. He held this position until November 2015. (Biter Decl. ¶ 2.)

4. In 2001, the United States Environmental Protection Agency (EPA) updated its maximum contamination level (MCL) to 0.010 milligrams per liter (mg/l) (or 10 micrograms per liter [mcg/L] or 10 parts per billion) of arsenic. (Wise Decl. ¶ 4; 40 C.F.R. § 141.62.)

5. The prior MCL for arsenic was 0.050 mg/L or 50 parts per billion. (Wise Decl. ¶ 4.)

6. The State of California adopted the EPA's arsenic MCL standard on November 28, 2008. (Wise Decl. ¶ 4; Cal. Code Regs. tit. 15, § 6431.)

7. As of July 6, 2010, 1,375 wells of 10,425 wells sampled in California had arsenic concentrations above the MCL. Kern County is one of the counties with the most wells above the arsenic MCL. (RJN, Ex. C.)

8. Before KVSP installed an arsenic-removal plant, its drinking water complied with the former MCL at 0.050 mg/L. Between October 2010 and January 2013, Kern Valley's arsenic level was less than half the former MCL, with quarterly averages for its two wells between approximately 0.012 mg/L and 0.021 mg/L. (Wise Decl. at ¶ 5; Lombardi Decl. Ex. E.)

---

[1] Hereinafter referenced as "UDF."

[2] **Error! Main Document Only.** Because Plaintiff did not file an opposition, he neither admitted or denied the facts set forth by defendant as undisputed nor filed a separate statement of disputed facts. Local Rule 56-260(b). Therefore, the Court was left to compile the summary of undisputed facts from Defendant's statement of undisputed facts and Plaintiff's verified complaint. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e). The Court notes for the record that Plaintiff was provided with the requirements for opposing a motion for summary judgment by Defendant in a notice filed on June 5, 2020. (ECF No. 90-1.) Therefore, the requirements of Rand v. Rowland, 154 F.3d 952, 962-63 (9th Cir. 1998), have been satisfied.

9. Kern Valley has two wells that provide drinking water for the entire prison, which provide the same water to inmates and staff. (Wise Decl. ¶ 3.)

10. While Defendant Biter was KVSP's acting Warden and Warden, KVSP and Defendant Biter posted quarterly notices reporting the levels of arsenic in KVSP's drinking water. The notices conformed with the ones the Department of Public Health required KVSP to post. (Wise Decl. ¶ 9; Biter Decl. ¶ 8; Lombardi Decl., Ex. E.)

11. The quarterly notices stated that the arsenic levels at KVSP did not present an emergency. (Lombardi Decl., Ex. E.)

12. The quarterly notices stated that inmates did not need to use an alternative water source. (Id.)

13. The quarterly notices did not state that KVSP's specific arsenic concentrations were high enough to cause illness. (Id.)

14. While Defendant Biter was KVSP's acting Warden and Warden, KVSP and Defendant Biter provided annual consumer confidence reports about its water to staff and inmates. (Biter Decl. ¶ 8; Wise Decl. ¶ 10; Lombardi Decl., Ex. E.)

15. While Defendant Biter was KVSP's acting Warden and Warden, KVSP and Defendant Biter tested its drinking water for contaminants and provided the test results to the California Department of Public Health. (Biter Decl. ¶ 8; Wise Decl. ¶ 8.)

16. Arsenic poisoning is generally in one of two forms: acute arsenic poisoning and chronic arsenic poisoning. (Geller Decl. ¶ 12.)

17. Acute arsenic poisoning causes dramatic, violent gastrointestinal illness, with hemorrhagic gastritis, nausea, vomiting, and diarrhea. This is followed by cardiac effects that can include shock and death, neurologic effects such as seizures, neuropathy, weakness, paralysis, and respiratory compromise, and hematologic effects including depression of red blood cell, white blood cell, and platelet counts. (Id.)

18. Even if KVSP's water contained double the amount of arsenic while it was out of compliance with the new MCL, it would be impossible for a human to drink enough of it at one time to suffer acute arsenic poisoning. (Geller Decl. ¶ 13.)

6

19. Chronic arsenic poisoning consists of long-term consumption of very large amounts of arsenic in drinking water that can cause very specific skin lesions; skin, bladder, and lung cancers; cardiovascular and cerebrovascular diseases; and diabetes mellitus. But the diseases typically require exposure periods of twenty years or more and exposure to drinking water with arsenic concentrations of generally more than 200 mcg/L or 200 parts per billion (ppb) (0.2 mg/L). (Geller Decl. ¶ 14.)

20. Arsenic has not been scientifically established to be toxic below 50 mcg/L or 0.050 mg/L. (Geller Decl. ¶¶ 21-22.)

21. There is no evidence that predicts illness from ingesting drinking water with an arsenic concentration 0.022 mg/L – the highest level KVSP's water had during the relevant time frame. (Geller Decl. ¶¶ 17, 29a, 29b.)

22. Even if a person drank water containing the levels of arsenic in KVSP's drinking water for an entire lifetime, it is unlikely they would experience any adverse health effects. (Geller Decl. ¶ 17.)

23. There is no evidence that Plaintiff ingested toxic or harmful doses of arsenic from any source. (Geller Decl. ¶ 28.)

24. Even when KVSP's water was out of compliance with the new MCL, it was safe to drink. (Geller Decl. ¶ 29b.)

25. No doctor ever diagnosed any of Plaintiff's alleged conditions as being caused by arsenic. (Heath Decl., Ex. K at 51:10-13.)

26. No toxicologist has informed Plaintiff the water was dangerous. (Id., Ex. K at 55:12-16.)

27. In 2008, after medical staff reported receiving injuries from inmates regarding KVSP's arsenic levels, KVSP's Executive Office, Dr. S. Lopez, D.O., contacted the California Poison Control System, Fresno/Madera, to inquire as to the possible health concerns raised by the levels of arsenic detected in KVSP's water. (Lopez Decl. ¶¶ 8-9, Ex. D.)

28. R. Geller, M.D., M.P.H., from California Poison Control, responded to Dr. Lopez that there were zero expected health problems, acute or chronic, presented by arsenic at a concentration of 22 parts per billion, such as KVSP's water. (Id. ¶ 10, Ex. D.)

29. Dr. Geller stated that there was no need for other public-health actions. (Id. ¶ 10, Ex. D.)

30. The process of installing an arsenic-removal plant at KVSP began around the time that KVSP was construed in 2005 and continued until it was completed in December 2012 to January 2013. (Wright Decl. ¶ 7; RJN, Ex. B.)

31. Installing an arsenic removal plant is a long process that requires funding through a capital outlay budget change planning, design, and input from consultants, engineers, Department of Corrections and facility officials, and several other state agencies. (Wright Decl. ¶ 7.)

32. KVSP's plant required funding through a capital outlaw, which is an expenditure for fixed-assets such as buildings, and plants, and requires a special request for funding that must proceed through the Department of Finance. (Id. ¶ 8; RJN, Ex. B.)

33. In 2008, the original funding allocated for the plant was insufficient based on the preliminary plans and reverted back to the budget, but in May 2009 the Public Works Board approved funds from General Fund AB 900 to modify the drawings and complete construction. (Wright Decl. ¶ 10.)

34. During the design phase for the arsenic-removal plant, the Department of Corrections reviewed other arsenic-removal facilities in order to determine the type of facility that would be best for KVSP. (Wright Decl. ¶ 12.)

35. The Department of Corrections conducted a pilot test at KVSP of the technology chosen for the plant to make sure that the future plant would meet KVSP's filtration needs. (Id. ¶ 14.)

36. The California Department of Public Health approved the Department's plan to install an arsenic-removal plant. (Lombardi. Decl., Ex. I.)

37. KVSP's plant used a coagulation/filtration process, which the EPA considers a best available technology. (Id. ¶ 15; 40 CFR § 141.62(c).)

38. Construction on the arsenic removal plant at KVSP began in October 2011, and continued until finished in December 2012. The project closed in January 2013. (Wright Decl. ¶ 15; Wise Decl. ¶ 13; Lombardi Decl., Ex. H; RJN Ex. B.)

///

39. As the acting Warden and Warden, Defendant Biter did not have the personal authority to authorize a project the size of the arsenic-removal plant. (Biter Decl. ¶ 5.)

40. When Defendant Biter was made KVSP's acting Warden, he understood that the Department of Corrections had already determined that installing an arsenic-removal plant was the best way to bring KVSP's water into compliance with the MCL. (Id. ¶ 4.)

41. Defendant Biter consulted with CME Dr. Lopez regarding the drinking water and was informed that the levels did not present a health concern. (Id. ¶ 9.)

42. Defendant Biter was never informed that the levels of arsenic in KVSP's drinking water presented a danger to Plaintiff, or anyone else. (Id. ¶ 11.)

43. Defendant Biter was never informed by a qualified health official that an alternative water source was necessary while the arsenic-removal plant was being designed and built. (Id.)

44. Defendant Biter deferred to the expertise of KVSP and the Department of Corrections' experts on matters regarding arsenic compliance. The staff working on the removal plant would report back to Defendant Biter regarding the progress of the planning, design, and installation of the plant. (Id. ¶ 7; Wise Decl. ¶ 14.)

45. KVSP considered drilling new wells or installing point-of-use filters at the prison, but determined those alternatives were not viable because of cost, feasibility of correcting the issue, and because the water did not present a risk to inmate and staff health to necessitate them. (Wise Decl. ¶ 15.)

46. The Department of Corrections also considered the possibility of connecting to the City of Delano's water system, which was working to build an arsenic-removal plant. It conducted an analysis and determined that a KVSP stand-alone plant was the best option. (Wright Decl. ¶ 12; Lombardi Decl. Ex. H; RJN Ex. B.)

47. Since completion of the KVSP arsenic removal plant, KVSP has complied with the MCL. (Biter Decl. ¶ 10; Wise Decl. ¶ 17.)

48. While KVSP was out of compliance with the new MCL, it was never ordered to stop providing water to staff and inmates from its wells to staff, its permit to provide was water was not revoked, and it was never ordered to provide an alternative water source. (Wise Decl. ¶ 18.)

**D.     Analysis of Defendant's Motion**

Defendant argues that KVSP's water was safe to drink, the arsenic levels in the drinking water was not ignored, and Plaintiff suffered no harm.  In the alternative, Defendants argue they are entitled to qualified immunity because it was not clearly established that it was unconstitutional to provide Plaintiff water that was safe to drink, but was above an existing maximum contaminant level.

The Eighth Amendment requires prison officials to provide human conditions of confinement, including adequate food, clothing shelter, and medical care, and to take reasonable measures to guarantee the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). A prisoner seeking relief for an Eighth Amendment violation must show that the official acted with deliberate indifference to a threat of serious harm or injury to an inmate. Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002). "Deliberate indifference" has both subjective and objective components. A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . must also draw the inference." Farmer, 511 U.S. at 837. Liability may follow only of a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 837.  The exposure to toxic substances can support a claim under section 1983. See Wallis v. Baldwin, 70 F.3d 1074, 1076-77 (9th Cir. 1995) (exposure to asbestos); see also Helling v. McKinney, 509 U.S. 25, 35-37 (1993) (using "demonstrably unsafe drinking water" as a hypothetical example of a potential conditions of confinement claim). Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. Farmer, 511 U.S. at 835; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

In his verified complaint, Plaintiff contends that he arrived at KVSP in October 2010, and that the water remained polluted through sometime in 2014.  Plaintiff claims that he suffered from pre-existing diseases, including liver disease, a tumor on his kidney, and stomach problems, and forcing him to drink the tainted water aggravated his medical conditions, caused problems with his digestive system and circulatory problems, and gave him an increased risk of cancer.  (Compl. ¶ 29.)  Plaintiff specifically alleges that being forced to drink the water over a prolonged period of years that he was housed at KVSP "[a]ccelerated and escalated his chronic liver disease."  (Id.)

The interpretation of medical test results and the evaluation of such results in the context of exposure to unreasonably high arsenic levels require medical and/or toxicological expertise. Fed. R. Evid. 701, 702. The issue is not whether there is arsenic in drinking water, but at what contaminant level the water becomes unsafe to drink, whether a named defendant was aware of a substantial risk to inmate health due to the contaminant level, and whether the prisoner's medical issues were caused by arsenic exposure. See Nguyen v. Biter, No. 1:11-cv-00809-AWI-SKO (PC), 2015 WL 5232163 (E.D. Cal. Sept. 8, 2015) (in prisoner civil rights action alleging KVSP drinking water contained arsenic, defendants granted summary judgment on objective prong of Eighth Amendment claim because, although there was arsenic in the local drinking water, prisoner provided no scientific evidence that the arsenic was present in sufficient amounts to cause the skin and other conditions he complained of, and there was no medical evidence that his conditions were specific to arsenic exposure), adopted by district court, September 30, 2015. In order to survive a motion for summary judgment, Plaintiff is required to show that his medical conditions were caused by arsenic exposure.

        1.        Objective Element-Substantial Risk of Serious Harm

Prison officials cannot ignore a condition of confinement "that is sure or very likely to cause serious illness." Helling v. McKinney, 509 U.S. at 33. The inquiry requires establishing that a serious harm existed, and there was a substantial risk of suffering that harm. The minute possibility that something may cause serious harm, such as disease, in the abstract does not establish a substantial risk unless the risk of developing the disease is substantial. Lopez v. McGrath, No. C 04-4782, 2007 WL 1577893, at *13 (N.D. Cal. May 31, 2007) (discussing whether risk of developing MRSA was a substantial risk). Plaintiff must prove that he was exposed to an unreasonably high level of arsenic. Helling, 509 U.S. at 35.

Defendant has presented evidence that KVSP's water did not present an objectively serious risk of harm. In 2001, the EPA updated its maximum contamination level (MCL) to 0.010 milligrams per liter (mg/L) (or 10 micrograms per liter [mcg/L] or 10 parts per billion) of arsenic. (UDF 4.) The State of California adopted the EPA's arsenic MCL standard on November 28, 2008. (UDF 6.) Between October 2010 and January 2013, Plaintiff consumed water with concentrations of arsenic between arsenic 0.012 mg/L and 0.021 mg/L. (UDF 8.) This was substantially under the prior EPA

11

1    and California maximum contaminant level of 0.050 mg/L.  (UDF 4-5, 8)  All U.S. public drinking
2    water contains arsenic at some concentration, and the difference between a medicine and a poison is
3    the dose.  (Geller Decl. ¶ 24d.)
4         Dr. R. Geller, a physician who is board certified in internal medicine, medical toxicology, and
5    emergency medicine, and before January 2018 was employed by the California Poison Control System
6    as Medical Director and Managing Director, declared that there is no evidence establishing that the
7    levels of arsenic in KVSP's water caused disease.  (UDF 23.)  Further, although arsenic may be
8    dangerous and cause acute or chronic poisoning, KVSP water did not contain high enough arsenic
9    concentrations.  (UDF 16.)  Dr. Geller declared and opined that even if a person drank water
10   containing the levels of arsenic in KVSP's drinking water for an entire lifetimes, it is unlikely that any
11   adverse health effects related to arsenic would occur.  (UDF 18.)  Indeed, chronic arsenic poisoning
12   typically only occurs when a person ingests 200 parts per billion of 0.2mg/L for over 20 years.  (UDF
13   19.)
14        Notices were posted stating that the amount of arsenic in KVSP's water did not present an
15   emergency.  (UDF 10-12.)  They also informed inmates and staff that they did not need to use an
16   alternative water source.  (UDF 12.)  Furthermore, the Department of Public Health had the authority
17   in California to remedy the situation by ordering KVSP to stop providing the water or suspending
18   KVSP's permit while it built its arsenic-removal plant.  Cal. Health & Safety Code §§ 11665(b)(3),
19   11625(a)-(b).  However, KVSP did not lose its permit, it was not ordered to stop providing water, and
20   it was not directed to provide an alternative source of water.  (UDF 48.)
21        Plaintiff also fails to demonstrate that the risk of arsenic exposure was "so grave that it
22   violate[d] contemporary standards of decency to expose anyone unwilling to such risk."  Helling, 509
23   U.S. at 36.  The risk cannot be one that "today's society chooses to tolerate."  Id.  In 2010, when
24   Plaintiff was at KVSP, approximately 1, 375 of the more than ten thousand wells tested in California
25   had MCL concentrations above the MCL.  Kern County, where KVSP is located, was one of the
26   counties with the most wells out of compliance.  (UDF 7.)  At that time, many free individuals
27   throughout the surrounding community—including the neighboring city of Delano and communities
28   throughout California—also had water that was out of compliance with the new MCL.  (UDF 7;

Wright Decl. ¶ 12; Lombardi Decl., Ex. H.)

With respect to Plaintiff medical condition, Plaintiff admitted that no doctor has every diagnosed his conditions as being caused by water, and no toxicologist has informed him the water was dangerous. (UDF 25-26.) Moreover, Dr. Geller attested that Plaintiff did not become ill from ingesting the arsenic concentrations in KVSP's drinking water. (Geller Decl. at ¶¶ 28, 29b, 29c.) Dr. Geller further opined that Plaintiff's future health will not be affected from consuming KVSP's drinking water, and he does not have any appreciable risk of developing any diseases associated with ingesting arsenic. (Geller Decl. at ¶¶ 28, 29c.)

The Court finds that Defendant has met their burden on summary judgment by producing evidence that drinking water containing arsenic in concentrations of less than 0.050 mg/L is safe to consume, and there is no evidence to demonstrate that drinking water with an arsenic concentration of 22 mcg/L or 0.022 mg/L, such as Kern Valley's water posed a risk to Plaintiff's health. In addition, there is no link to any medical consequences that Plaintiff suffered as a result of the arsenic levels at Kern Valley. Plaintiff has failed to rebut Defendant's evidence, and Defendant is therefore entitled to summary judgment.[3]

    2. <u>Subjective Element-Knowledge of Substantial Risk of Serious Harm</u>

"Deliberate indifference is a high legal standard," <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004), and requires a "sufficiently culpable state of mind," <u>Hearns v. Terhune</u>, 431 F.3d at 1040. Defendant is only liable if he knew of an excessive risk of harm and disregarded the risk. Farmer, 511 U.S. at 838. A defendant must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the defendant] must [] draw the inference." <u>Id.</u> If the defendant did not know about the risk, he did no inflict the injury. <u>Id.</u>

It is undisputed that at the time Defendant Biter became the acting Warden of KVSP in 2010, the process of bringing KVSP's drinking water into compliance with the new MCL was already underway. (UDF 30, 40.) CDCR and KVSP were engaged in installing an arsenic-removal plant to

---

[3] Although the failure of proof as to the objective element is fatal to Plaintiff's claim, the Court elects to address the subjective element as well. <u>Helling</u>, 509 U.S. at 35.

bring KVSP into regulatory compliance. (UDF 30, 40.) Construction of the arsenic removal plant at KVSP began in October 2011, and continued until finished in December 2012. The plant was completed and the project was closed in January 2013. (UDF 38.) Since that time, KVSP's drinking water has been in compliance with the MCL. (UDF 47.)

The evidence presented demonstrates that KVSP's officials did not ignore the issue but rather investigated and made reasonable attempts to resolve the issue. Defendant Biter and his staff provided monthly water tests to the California Department of Public Health, posted quarterly notices required by the Department of Health regarding the arsenic levels, and provided consumer confidence reports. (UDF 10-14.) Defendant Biter was not directly involved in the construction of the arsenic removal plant, and he generally deferred to the expertise of KVSP and correctional staff who would report back to him regarding the progress of the planning, design, and installation of the plant. (UDF 44.) During the design phase for the arsenic-removal plant, the Department of Corrections reviewed other arsenic-removal facilities in order to determine the type of facility that would be best for KVSP. (UDF 34.) KVSP considered drilling new wells or installing point-of-use filters, but these alternatives were not feasible given the appropriate considerations. (UDF 45.)

Moreover, the evidence supports the finding that Defendant Biter was not aware of any serious risk of harm. <u>Farmer</u>, 511 U.S. at 838. Defendant Biter consulted with KVSP's CME and was informed that water was not dangerous. (UDF 41.) The quarterly notices that were posted indicated the arsenic levels at KVSP did not present an emergency and there was no need to use an alternative water source. (UDF 10-12.) Ultimately, Defendant Biter was never informed that the water was dangerous or that he should provide an alternative source of water to prevent KVSP's inmates and staff from being harmed. (UDF 42-43.) Based on the evidence presented, Defendant Biter was never aware that KVSP's water presented a risk to Plaintiff and summary judgment is appropriate.[4]

///

///

---

[4] Because the Court has found that Defendant is entitled to judgment on the merits, the Court does not reach Defendant's alternative argument that he is entitled to qualified immunity.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendant Biter's motion for summary judgment be granted; and

2. The Clerk of Court be directed to enter judgment in favor of Defendant.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 19, 2021**

UNITED STATES MAGISTRATE JUDGE